AO106 (Rev. 12/03) Affidavit for Search Warrant

# UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

FILED

08 MAR -6 PM 2:20

SOUTHERN DISTRICT OF CALIFORNIA

BY DEPUTY

In the Matter of the Search of
(Name, address or brief description of person, property or premises to be searched)

Sentry Safe, Model #1170, owned and controlled by Melvin Alexander.

APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT

Case Number: '08 MJ 0719

I, Robert A. Harris being duly sworn depose and say:

I am a(n) Special Agent, Federal Bureau of Investiation (FBI) and have reason to believe
Official Title

that ☐ on the person of or ☑ on the property or premises known as (name, description and/or location)

See Attachment A

in the SOUTHERN District of CALIFORNIA

there is now concealed a certain person or property, namely (describe the person or property to be seized)

See Attachment B

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)

Property that Constitutes evidence of the commission of a criminal offense

concerning a violation of Title 21 United States code, Section(s) 841, 846

The facts to support a finding of probable cause are as follows:

Described in Supporting Affidavit

Continued on the attached sheet and made a part hereof: ☑ Yes ☐ No

[signature]
Signature of Affiant

Sworn to before me and subscribed in my presence,

3/6/08 at San Diego CA
Date City State

CATHY ANN BENCIVENGO
U.S. MAGISTRATE JUDGE

Name of Judge Title of Judge

[signature]
Signature of Judge

# AFFIDAVIT

I, Robert A. Harris, Special Agent, Federal Bureau of Investigation (FBI), United States Department of Justice, being duly sworn, state as follows:

## A. EXPERIENCE AND TRAINING

1. I am a "law enforcement officer of the United States" within the meaning of Title 18, United States Code (U.S.C.), § 2510(7), who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, U.S.C. § 2516. I am a duly appointed Special Agent of the FBI and have been employed as such since August 1996. Since June 2006, I have been assigned to the San Diego Violent Crimes Task Force - Gang Group, a multi-agency task force composed of federal, state, and local law enforcement personnel tasked with investigating criminal gang enterprises and related criminal activities occurring in the Southern District of California, and elsewhere. Prior to my current assignment, during a period from approximately March 2002 through November 2005, I was assigned to investigate violent gangs and criminal enterprises in the Central District of California and then in the Southern District of California as of December 2005.

2. In December 1996, I completed Special Agent's training at the FBI Academy in Quantico, Virginia. The training included instruction in conducting investigations of violations of federal statutes to specifically include Titles 18 and 21 of the United States Code. Since completing initial training at the FBI Academy, I have received specialized training from the FBI in conducting Criminal Enterprise investigations. Additionally, I have attended numerous gang investigation related training administered by other law enforcement agencies and related professional organizations. I have gained experience investigating criminal organizations engaged in conspiracies to manufacture and/or possess with the intent to distribute controlled substances, including marijuana, methamphetamine, and cocaine base.

3. I have directed and/or participated in a number of drug trafficking investigations conducted by the FBI and other law enforcement agencies, which resulted in the arrest of numerous subjects and the seizure of controlled substances. I have interviewed defendants in gang investigations and convicted drug traffickers on numerous occasions who had agreed to cooperate with government officials. I have also reviewed numerous records of interviews conducted by other investigators. I have

also directed, supervised or participated in numerous searches of residences of suspected drug traffickers for controlled substances and other evidence of drug trafficking. I have discussed with other FBI and Drug Enforcement Administration ("DEA") agents, as well as other narcotics investigators, who have advised me when relating the substance of their similar experiences and the results of their own investigations and interviews. As a result of my training and experience, and interactions with other experienced Special Agents, Task Force Agents/Officers, and other investigators, I have become knowledgeable with the distribution and trafficking methods employed by drug traffickers to safeguard, store, transport, and distribute drugs, and to collect and conceal drug-related proceeds. I have also become versed in the methods employed by gang members engaged in drug trafficking to communicate with other participants to accomplish the aforementioned objectives. (Henceforth, references to "agents" or "officers" refers to both federal agents and local law enforcement officers working with them, unless otherwise specified).

4. I have become knowledgeable in the methods and modes of narcotics operations, and the language and patterns of drug trafficking. I am aware of techniques that are often used to attempt to detect and/or hinder law enforcement investigations of gang members engaged in drug trafficking including the utilization of multiple cellular telephones; the use of digital and/or text pagers; counter-surveillance equipment and techniques; the use of false and/or fictitious identities; and the use of coded communications and conversations.

5. My experience as a Special Agent with the FBI, my participation in the investigation of narcotic organizations, my conversations with other Special Agents familiar with narcotic trafficking and money laundering matters, and my training form the basis of the opinions and conclusions set forth below, which I drew from the facts set forth herein. From my training and experience and the training and experience of other Special Agents, I have learned the following::

a. Individuals involved in drug trafficking often maintain the following items in safes or lock boxes: controlled substances and paraphernalia for packaging, weighing, cutting, testing, distributing and manufacturing controlled substances.

b. Individuals involved in drug trafficking often maintain records of their narcotics transactions and other records of evidentiary value for months or years at a time. It is common, for example, for drug traffickers to keep pay/owe sheets or other papers of drugs sold and monies owed. Such pay/owe sheets or papers are used as a basis for accounting and for settling existing debts. Such records are often maintained for a substantial period of time even after the debts are collected. I have found in my training and experience that such records are invaluable to drug traffickers and that such records are rarely discarded. Finally, it has also been my experience that such records and pay/owe sheets also frequently include the names, identities and telephone numbers of suppliers, customers and co-conspirators.

c. Individuals involved in drug trafficking commonly earn income in the form of cash and try to legitimize these profits. In order to do this, traffickers frequently attempt to secrete, transfer and conceal the money by means, including, but not limited to: placing assets in names other than their own to avoid detection while maintaining control; laundering the money through what appears to be legitimate business or businesses; hiding money in their homes, safes and safety deposit boxes; or using the money to buy assets which are difficult to trace. Records of these and other types of transactions are often found at the residences of individuals involved in drug trafficking.

d. Individuals involved in drug trafficking often keep and maintain large amounts of United States currency at their residences. Such funds are often used for every day expenditures and to maintain and finance their ongoing drug business. Additionally, individuals involved in drug trafficking often amass and maintain assets at their residence which were generated by their trafficking activities, or purchased with the cash earned from such trafficking.

e. Individuals involved in drug trafficking often maintain weapons, firearms and ammunition on their person, in their residence and/or in safes or lock boxes. Such firearms are used, and can be used, as an instrumentality of the crime of possession and distribution of drugs.

f. Individuals involved in drug trafficking often maintain photographs, and/or audio and video recordings of their associates or real and personal property which were acquired

with drug proceeds or property utilized to facilitate drug trafficking activities. Such items are typically maintained in their residences or safes.

6. This affidavit supports an application for a warrant to search and seize evidence from the safe described below.

**B. ITEM TO BE SEARCHED**

7. I submit that the facts contained in the numbered paragraphs below are accurate, and that they demonstrate that there is probable cause to believe that documents and records and other instrumentalities and evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 846, and Title 18, United States Code, Sections 2 and 1956(h), will be found in the item for the individual specified below. The item is more particularly described in **Attachment A** to the search warrant, which is incorporated therein by reference. I specifically believe that there is probable cause to believe the item in Attachment A is likely to contain documents associated with the listed individual. The item to be searched, along with the relevant owner, is as follows:

a. Sentry safe, model 1170, owned and controlled by Melvin ALEXANDER.

**C. PROPERTY OR ITEMS TO BE SEIZED**

8. I request permission to search and seize documents and all other instrumentalities and evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 846, and Title 18, United States Code, Sections 2 and 1956(h), as demonstrated in this attached affidavit. See **Attachment B** for further details.

**D. INTRODUCTION**

9. Since at least 2006, law enforcement officials have been investigating the drug-trafficking activity of **Lee Vaughn WALKER**, aka "Lee Dog," who, along with his associates, distributes methamphetamine, cocaine base in the form of crack cocaine (herein after "crack cocaine") and marijuana, mainly out of WALKER's apartment at 4881 Rolando Court, Apartment 69, San Diego, California ("WALKER's apartment").

10. In February 2007, the Federal Bureau of Investigation ("FBI") began an active investigation of WALKER and his criminal associates, including **Melvin ALEXANDER**. Between

March 2007 and October 2007, a confidential source ("CS") made five controlled purchases of crack cocaine and three receipts or controlled purchases of marijuana from WALKER.

11. In September 2007 and October 2007, the Honorable Roger T. Benitez, District Judge, United States District Court for the Southern District of California, issued orders authorizing the interception of electronic communications occurring to and from telephones used by WALKER, specifically, telephone numbers (619) 471-7660 and (619) 602-5547 ("Target Telephones"). Also, on or about September 17, 2007, agents installed a stationary camera to record visual surveillance of the front of WALKER's apartment.

**E. INVESTIGATION OVERVIEW**

12. As mentioned above, in 2006 an San Diego Police Department ("SDPD") Detective learned that WALKER was selling narcotics, based on conversations with other law enforcement officers, confidential sources, cooperating defendants, and complaints from tenants residing in the same apartment complex as WALKER, alleging that a black male was selling narcotics from WALKER's apartment. In 2007, the FBI began a formal investigation of WALKER, including hiring CS to make purchases of narcotics from WALKER that were recorded and monitored. CS has been cooperating with the FBI since 2004. In that time period, CS has consistently provided truthful information which was corroborated by other confidential sources and/or other investigators. CS has felony convictions for perjury (specifically, using a fake birth certificate to apply for a driver license, and then signing the driver license application under penalty of perjury), grand theft, and theft by use of access card data in 1991; forge an access card to defraud in 1995; second-degree burglary in 1996; and false checks/record/certifications in 2003.

13. On or about September 17, 2007, the FBI installed a stationary video camera which allows monitoring of the front of WALKER's apartment. Between September 21, 2007 and November 19, 2007, the FBI intercepted conversations on one or both of the Target Telephones belonging to WALKER.

14. In October 2007 and November 2007, with the aid of the Court-authorized interceptions of WALKER's telephones, law enforcement officers made one seizure of methamphetamine and two seizures of crack cocaine.

**INTERCEPTS: Storing of Narcotics at ALEXANDER's Apartment (Nov. 5, 2007)**

15. On November 5, 2007, at approximately 10:14 a.m., WALKER and ALEXANDER spoke on the telephone about a female who may have stolen either money or narcotics from ALEXANDER the previous day. ALEXANDER told WALKER that he was out looking for her the previous night, but was unable to locate her. WALKER told him not to put all his energy into trying to find her, and told ALEXANDER that when he does find her, he needs to take care of business. ALEXANDER told WALKER that because of the problem with the female, ALEXANDER would have to keep just "a little bit" in his house. ALEXANDER added that he would still get what he normally gets from WALKER, but he would keep just a little bit at his house because he was worried the female might tell on him. Based on my training and experience, and my review of hundreds of intercepts in this case, I believe that "a little bit" refers to a small amount of narcotics. I believe that ALEXANDER was saying that he would continue to obtain the same amount of narcotics from WALKER, but that he would be keeping less of it at his residence, because he was afraid the female might report him to the police.

**Arrest of ALEXANDER by SDPD (Dec. 17, 2007)**

16. On December 17, 2007, the San Diego Police Department arrested ALEXANDER at his residence, 6225 Stanley Avenue, Apartment 1, in San Diego, California, for possession of methamphetamine and crack cocaine. In addition to the seizure of approximately 2.0 grams of crack cocaine and 8.2 grams of methamphetamine, $2,106.00 United States Currency was also seized, which was on ALEXANDER's person at the time of his arrest.

**Arrest of WALKER, ALEXANDER and Co-Conspirators by FBI (Jan. 16, 2008)**

17. On January 16, 2008, WALKER and his criminal associates, including ALEXANDER, were arrested for Conspiracy to Distribute Cocaine Base in the form of Crack Cocaine and/or Conspiracy to Distribute Methamphetamine. WALKER, ALEXANDER and their criminal associates remain in federal custody, pending litigation.

18. On January 17, 2008, a Sentry safe, belonging to ALEXANDER, was turned over to the San Diego Police Department by a neighbor of ALEXANDER. According to the neighbor, approximately two months ago, ALEXANDER brought the safe to the neighbor's apartment, and requested the neighbor hold onto the safe on a temporary basis. ALEXANDER possessed the only key known to the neighbor, which allowed access to the safe. The neighbor estimated ALEXANDER accessed the safe approximately three to four times after leaving the safe with the neighbor.

**F. CONCLUSION**

19. Based on the facts summarized above, and my ongoing participation in this investigation, your affiant believes that agents are likely to find narcotics, documentation and proceeds from criminal activities conducted by ALEXANDER in the item listed in Attachment A.

20. Based on the foregoing, your affiant believes that probable cause exists that the item listed in Attachment A contains property that constitutes evidence of the commission of an offense under Title 21, United States Code, Sections 841(a)(1) and 846, and Title 18, United States Code, Sections 2 and 1956(h); contraband and fruits of such offenses; and property designed and intended for use and which had been used as the means of committing such offenses. Such property is more particularly described in Attachment B to this affidavit.

21. Wherefore, your affiant respectfully requests that a search warrant be issued for the item listed in Attachment A, authorizing a search of the item and the seizure of the items described with particularity in Attachment B to the Application and Affidavit for Search Warrant.

//

//

//

//

//

//

//

//

22. WHEREFORE, I respectfully request that the Court issue a search warrant for the item listed in section B above (and more particularly described in Attachment A) to seize the items in Attachment B of this application.

ROBERT A. HARRIS
Special Agent
Federal Bureau of Investigation

SUBSCRIBED and SWORN to before me
this 6 th day of March, 2008.

Hon. Cathy Ann Bencivengo
United States Magistrate Judge

## ATTACHMENT A

## ITEM TO BE SEARCHED

The safe, currently located at the San Diego FBI, is further described as follows:

Off-white Sentry Safe, Model #1170, approximately 14"x10"x13", with a key entry system. The key entry location is located on the front side of the safe. Above and to the left and right side of the lock are the words "Sentry" and "1170", respectfully. See picture of safe to be searched below.



# ATTACHMENT B

## ITEMS TO BE SEIZED

1. Controlled substances, including but not limited to cocaine base and methamphetamine, and paraphernalia for packaging, weighing, cutting, testing, distributing, growing, and identifying controlled substance(s), including baggies, plastic wrapping, scales and other weighing devices.

2. Documents and electronic devices (and their contents) containing data reflecting or memorializing the ordering, possession, purchase, storage, distribution, transportation and sale of controlled substance(s), including buyer lists, seller lists, pay-owe sheets, records of sales, log books, drug ledgers, personal telephone/address books containing the names of purchasers and suppliers of controlled substances, electronic organizers, spreadsheets, rolodexes, telephone answering pads, bank and financial records, and storage records, such as storage locker receipts and safety deposit box rental records and keys.

3. Money and assets derived from or to be used in the purchase of controlled substance(s) and records thereof, including U.S. currency, precious metals and stones, jewelry, negotiable instruments and financial instruments including stocks and bonds, and deeds to real property, books, receipts, records, money drafts, money order and cashiers check receipts, passbooks, bank checks, and records of safety deposit boxes and storage lockers.

4. Weapons, firearms, firearms accessories, and ammunition and documents relating to the purchase and/or possession of such items.

5. Equipment used to detect police activities and surveillance, including radio scanners and tape and wire transmitter detectors.

6. Photographs and electronic images, such as video recordings and tape recordings (and their contents) which document the association with other co-conspirators and/or which depict narcotics, firearms, cash, real property, vehicles or jewelry.

7. Telephone paging devices, beepers (and their contents), cellular/mobile phones (and their contents), and other communication devices which evidence participation in a conspiracy to posses, manufacture, or distribute controlled substances.